IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

DAVID W. LINDSAY, a minor, by
SHANEE HIGGENBOTHAM,
      Plaintiff,

v.                                        Civil Action No. 3:04cv108
                                             (Judge Broadwater)

JO ANNE B. BARNHART, COMMISSIONER OF
SOCIAL SECURITY,
      Defendant.

## REPORT AND RECOMMENDATION/OPINION

Plaintiff, David W. Lindsay, a minor, by his mother Shanee Higgenbotham, brought this action pursuant to 42 U.S.C. § 1383(c)(3), which incorporates by reference 42 U.S.C. § 405(g), to obtain judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying his claim for child's supplemental security income ("SSI") under Title XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 1381-1383f. The matter is awaiting decision on the parties' cross motions for summary judgment and has been referred to the undersigned United States Magistrate Judge for submission of proposed findings of fact and recommended disposition. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b).

## I. Procedural History

On May 23, 1995 , David Lindsay's ("Plaintiff") mother applied for child's SSI on behalf of Plaintiff pursuant to title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383f (R. 77). She alleged disability beginning about a year after his birth, September 1, 1989, due to Attention Deficit Hyperactive Disorder ("ADHD") (R. 82). Plaintiff was originally found eligible for SSI, with an onset date of disability of May 1, 1995, based on this application (R. 25). His claim was subsequently reviewed and it was determined he was no longer disabled as of August 1, 1997.

Plaintiff requested a reconsideration of this determination. Plaintiff's mother was notified on December 16, 1997, that the disability hearing officer had affirmed the determination. No further action was taken regarding the cessation determination.

On May 31, 2000, Plaintiff, by his mother, filed a new application for Child SSI, again alleging disability beginning on September 1, 1989 (R. 77). The claim was denied initially and upon reconsideration (R. 57, 64). A timely request for hearing was filed and Administrative Law Judge Randall Moon ("ALJ") held an administrative hearing on September 20, 2001 (R. 448). Plaintiff, represented by counsel, appeared and testified along with his mother. On December 20, 2001, the ALJ issued a hearing decision denying the claim (R. 25-33). On December 26, 2002, the Appeals Council denied Plaintiff's Request for Review, thus making the ALJ's decision the Commissioner's "final decision" under 42 U.S.C. § 405(g) (R. 34-35). Plaintiff filed his complaint seeking judicial review pursuant to 42 U.S.C. § 1383(c)(3) on November 16, 2004.[1] On January 6, 2005, United States District Judge W. Craig Broadwater remanded the case, at the request of the Commissioner, in order that the Commissioner might complete or reconstruct the administrative record, the tapes of the hearing having been misplaced or lost. That having been accomplished, this matter is now properly before the Court.

## II. Statement of Facts

David Lindsay ("Plaintiff") was born on August 24, 1988, and was one year old on his alleged onset date and 13 years old at the time of the ALJ's decision (R. 74). His mother alleged he

---

[1]On February 25, 2003, Plaintiff requested an extension of time of at least 30 days for filing a complaint in the United States District Court (R. 10). On October 21, 2004, more than a year and a half later, the Administration granted Plaintiff's request for an extension of time, and gave him 30 days to file a civil action with the Court.

became disabled at the age of one, due to ADHD (R. 82). She originally applied for SSI on his behalf on May 23, 1995, after he was diagnosed with ADHD. Plaintiff was in the first grade at the time. At the time of the original application, Plaintiff had a Medicaid card (R. 84). He had just started on medication.

Plaintiff underwent psychoeducation testing in April 1995 (R. 339). He was six years old and in the first grade. The evaluator noted:

> David was extremely active during the evaluation and required frequent redirection to complete the tasks. His effort was also noted to be poor at times. These results are considered an accurate reflection of his current level of functioning, but may underestimate his best performance.

(R. 339). On the WISC III IQ test, Plaintiff obtained a full scale score of 70, verbal 60, and performance 83 (R. 339). He was no more than approximately one year below level in all areas. The evaluator found the achievement tests were "somewhat discrepant with his poorer performance on the intellectual measure (in particular verbal comprehension tasks) and may more accurately reflect his level of functioning."

(R. 340).

A neuropsychological evaluation was performed at about the same time (R. 341). During the interview Plaintiff was distractible and easily frustrated (R. 342). He needed frequent redirection. He attempted all tasks presented to him although there were times when he did not appear to be putting forth his best effort. The results of the evaluation were considered to be an accurate estimate of his current cognitive functioning, although the evaluator again opined they may have underestimated his abilities, given the interference from behavioral disruptions (R. 343) The evaluator concluded that Plaintiff had ADHD, and recommended treatment including medication and

3

behavior therapy, plus parent training for his mother.

State agency reviewing psychologist Samuel Goots, M.D., found Plaintiff met listing 10.11, based on 112.08 personality disorder and 112.11 ADD/Hyperactivity (R. 353).

A psychological evaluation was completed in August 1995 (R. 348). Plaintiff obtained scores on the WISC III of 80 verbal, 93 performance, and 84 full scale (R. 351). He was on medication at the time. This appeared to be valid measurement of his ability, even though several prompts were needed to keep him on task. He did not interact very well with the examiner and staff, and required constant urging to keep on task and answer questions. His concentration appeared to be somewhat hindered, but within normal limits. His pace was slow.

At the time of the original application, when Plaintiff was six years old and in the first grade, his mother described Plaintiff's typical day as:

> Into everything- can't sit still, fights with sister and brother all the time. Takes fits when he doesn't get his way. Doesn't listen very well. Goes to school. Rides bike, plays with dinosaurs, tools.

(R. 96).

She stated that Plaintiff needed special help with his daily activities, explaining: "Mother has to check on him to make sure he does his bath and teeth as he should" (R. 96). She also stated that he fought with his brother and sister, fought at school, and lied a lot (R. 97). He would get into things he was not supposed to, break things, scream, kick, throw things, and hit himself in the face when he did not get his way (R. 99). He sometimes threw his food on the walls or at his brother or sister. He could dress himself, but sometimes put his clothes on backward. His clothes did not match. He did not want to listen to learn to play cards or board games. He would not sit still for his mother to teach him to read and write. "He just plain refuses to do it." His first grade teacher

4

referred him for counseling. His medication calmed him down sometimes, but not all the time.

Plaintiff's first grade teacher wrote that Plaintiff had difficulty sitting and listening, and did not learn to write "much of anything" until the end of first grade. He would work for a while, but became bored quickly and played. He needed constant support from his teacher and seldom completed his assignments. The teacher noted that she and Plaintiff got along well as long as he was not forced into doing things. He had one or two friends, who also were not well behaved. If pressured by other teachers he would refuse to do anything. He would often sit on his desk, break crayons, cut paper, play with glue, and talk when he should have been listening (R. 102-104).

The teacher noted Plaintiff was able to take care of his own personal needs and safety (R. 105). He understood authority and school rules, and showed a sense of responsibility for himself and respect for others (R. 105). He attended class regularly and was placed in the second grade with 23 other students.

Plaintiff's second grade teacher wrote that he was in the process of being tested for special education, but was in regular classes, except for speech (R. 107). He read at grade level, but his comprehension skills, math, and written responses were below grade level. He could keep up with the class but at times would "simply give[] up." He had trouble staying on task. Homework was usually not turned in. When something interested him, he would work hard. He had trouble expressing himself (R. 108). He had no other handicaps. When asked how Plaintiff related to her, the teacher wrote:

> David and I get along. He does get angry, when he doesn't want to do something but will listen to me. David has a few friendships, however most of the time he bothers other students.

(R. 108). She reported Plaintiff had trouble behaving in class. He broke pencils and crayons and

jumped on his chair. He had hit other students. There were times when he would be very quiet and in control, but he could become uncooperative quickly. His behavior varied from day to day. He was able to take care of his personal needs. There were times when he did not respect authority, frequently talking back to teachers. He had trouble staying on task when he was doing something new or challenging. He paid attention when he could do what he wanted, but when asked to change had difficulty concentrating.

Plaintiff underwent a psychoeducational evaluation in March 1997 (age 8, grade 2) (R. 356). He obtained IQ scores of 70 verbal, 80 performance, and 73 full scale on the WISC III. The evaluator noted Plaintiff was cooperative and attempted all tasks presented. He digressed frequently from tasks. He attended to and followed directions adequately, but often asked questions or volunteered comments unrelated to the test. He was found to be in the borderline range of intelligence.

In May 1997, Plaintiff's mother wrote that his medication had helped him a lot, although he still had problems (R. 168). She noted his behavior was improved when he was on the medication (R. 168). She wrote that his ability to progress in learning was limited because he became frustrated very easily (R. 173). She noted that he was sometimes very hard to get along with, breaking and slamming things, lying, and getting angry easily (R. 175). He helped around the house, but she had to make him to it most of the time.

In June 1997, Plaintiff's father said Plaintiff had finished the school year "ok" (R. 390). The school was recommending a Learning Disabilities class the next year. For summer Plaintiff would be home with family.

Dr. Goots completed another Childhood Disability Evaluation Form in August 1997, finding Plaintiff did have ADHD, a severe impairment, but no longer met, medically equaled or functionally

6

equaled the severity of a listing (R. 358). There was no evidence of limitation of motor, social, or personal functioning, and less than marked limitations in cognitive/communicative and concentration, persistence or pace (R. 360). He did not have a marked limitation in any area of functioning.

Plaintiff's claim was subsequently reviewed and it was determined he was no longer disabled as of August 1, 1997. Plaintiff requested a reconsideration of this determination.

A second State reviewing psychologist came to the same conclusions as Dr. Goots in September 1997 (R. 364), except for finding Plaintiff also had a less than marked limitation in social functioning.

In September 1997, the mother reported Plaintiff was nine years old and started at a new school (R. 388). There were no behavior problems. The Ritalin was "really helping" with the hyperactivity, but seemed to leave his system before the next dose. He became more hyper after the Ritalin left his system. The doctor referred to this as rebound hyperactivity and increased the Plaintiff's dosage to one "more appropriate for his age."

On October 21, 1997, a teacher noted that she had received a note from Plaintiff's father stating "that family had no med. to send to school for David" (R. 251). Plaintiff was fidgety and misbehaving by 8:45 a.m. The teacher eventually had to remove him from the classroom. His parents were called. Plaintiff's mother said he would have his medication the next day (R. 252).

That same day, Plaintiff's mother called the doctor's office stating Plaintiff was out of medication and the school would not allow him back without it (R. 387). She reported he had been doing well on the increased dose of Ritalin in the morning. Dr. Norman renewed Plaintiff's prescription.

On October 27, 1997, the mother reported the increased dosage was not helping, and she was still getting calls from school (R. 386). The grandmother and father, however, who watched Plaintiff on the weekends, believed there was a difference, as did the school. The doctor noticed that in her office Plaintiff sat and quietly played with cars. The doctor discussed discipline with the mother. Plaintiff's mother said it was "hard to do." She would put him in his room where he would play, or she would take things away from him for "months." The doctor suggested she remove things for shorter periods of time so Plaintiff could remember what he had done wrong. The doctor felt the mother's reports were inconsistent with the school's and her own observations, and therefore felt there was no need for a change in medication, but did increase his dosage.

Plaintiff's mother was notified on December 16, 1997, that the disability hearing officer had affirmed the determination that Plaintiff's disability had ceased. She took no further action.

In December 1997, Plaintiff's teacher wrote that he was mainstreamed for Science, Social Studies, Health, Spelling, Art, Music, Basic Skills, and Physical Education (R. 112). He was OHI[2] due to his behavior. He was working at grade level in reading, math, science, social studies, health, spelling, and writing. Reading and math were taught in the special education classroom with minor modifications, however, due to his attention problems. He frequently needed to be brought back on task to finish written assignments. Otherwise, Plaintiff was able to keep up with the class pace.

The teacher noted that Plaintiff had the ability to complete assignments, but often did not

---

[2]Other health impairment means having limited strength, vigor or alertness, including a heightened alertness to environmental stimuli, that results in limited alertness with respect to the education environment, that – (i) is due to chronic or acute health problems such as asthma, attention deficit disorder, attention deficit hyperactivity disorder, diabetes, epilepsy, hemophilia, lead poisoning, leukemia, nephritis, rheumatic fever, and sickle cell anemia; and (ii) Adversely affects a child's educational performance. See 20 U.S.C. § 1401(3)(A).

complete them on time (R. 112). He tried to do the least amount of work possible or did not do the

assignment at all. He required a great deal of encouragement and reminding to complete his written

work. He had no communication deficits or any other handicaps. When asked how Plaintiff related

to her, the teacher wrote:

> David can be very defiant and argue with adult authority. He has to
> have the last word. David doesn't have many friends. He can be very
> aggressive toward other children (ex. poking children with pencils,
> hitting, pushing, tripping, calling children names). Peers seem to be
> intimidated by David's periodic aggressive behaviors.

(R. 113). The teacher noted that Plaintiff was aggressive, destructive, defiant, and self-abusive

(scratching himself), and made noises during class. These behaviors increased when he was not

administered his medication on a regular basis (R. 114). She also noted twice that if Plaintiff did

not have his medication his behavior worsened dramatically.

When asked about specific problems with attention and concentration, the teacher wrote:

> If medication is not administered on a regular schedule, David is very
> easily distracted and cannot attend to a task.

(R. 115).

Plaintiff's special education teacher also wrote in December 1997, that Plaintiff was working

at grade level in reading, math, science, social studies, health, spelling, and writing (R. 117). He

took math and reading in special education classroom with minor modifications due to attention

problems. He was mainly in special education for behavioral reasons. He was able to keep up with

the pace, but often needed to brought back on task to finish assignments. He had the ability to

complete assignments, but often did not. In the teacher's very structured class, Plaintiff's behavior

was normally compliant. He often tried very hard to please. Five times since the school year started

he had been defiant. He had established some friendships, but often had difficulty accepting peer

9

criticism.

He could be defiant, aggressive, and self-abusive. His classmates at times were afraid of him. The teacher noted: "It is documented that the behaviors do occur more frequently when the medicine has not been distributed." And again: "The behaviors increase when the medicine is not distributed on a regular basis or only at school." She did note that the medication had recently been increased, and when given as prescribed Plaintiff tended to be very tired. She hoped this effect would level off as time went on.

Where asked to describe specific attention or concentration problems, the teacher wrote:

> If medication is not distributed on a regular schedule he can be easily distracted and has trouble concentrating. Concentration is especially difficult when the subject that is being taught is difficult for him (math).

The teacher commented:

> I feel the main academic difficulty with David is his behavior. I feel that if his behavior was under control I think that David would progress at the "normal" developmental and age appropriate rate as his same age peers. His behavior is his main difficulty. When David is on his regular medication schedule, academic gains are noted on a consistent basis.

Another teacher wrote that Plaintiff did not relate or interact well with others when he was "having a bad day (no meds.)" (R. 127). He did not seem to have friends. His behavior varied. His behavior had worsened because he did not have his medication. Without medication his behavior was very inappropriate. He exhibited a sudden change of behavior "due to 'no meds.'" He was easily distracted if he did not have his medication.

Plaintiff's father wrote in December 1997: "I think the medicine works okay while he is on it but when he runs out he is bad" (R. 123).

10

On January 8, 1998, Plaintiff's mother reported that Plaintiff had had a good holiday. She felt the Ritalin was causing problems, however (R. 383). The doctor decided to switch him to Dexadrine.

On February 13, 1998, Plaintiff's mother called requesting a refill of Plaintiff's prescription (R. 383). Plaintiff had had an appointment scheduled the day before, but had not kept it. Dr. Norman would not write a prescription under those circumstances, however, and scheduled an appointment for February 17.

On February 18, Plaintiff's mother again called the doctor to say Plaintiff needed a prescription (R. 382). The doctor noted Plaintiff had had a dosage change, and wanted to see him before writing a new script. She scheduled an appointment on February 24.

On February 24, 1998, Plaintiff's mother reported to Dr. Norman that the school had noticed a positive difference in Plaintiff's behavior since his medication was switched to Dexadrine (R. 381). She noted, however, that he was also aggressive at times. The mother thought that perhaps the medication was causing this, but the doctor felt the problem was that the mother did not discipline him at home. She noted: "This is probably setting the stage for the school problems." Plaintiff's next appointment was scheduled for March (R. 382).

In July 1998, Plaintiff's mother called Dr. Norman stating that Plaintiff was "out of meds." He had last been seen in February (and had been scheduled for an appointment in March). The office scheduled an appointment for the next day (R. 380).

At the July appointment, Plaintiff' mother informed Dr. Norman that Plaintiff had passed the school year, but was bored over the summer, because he did not have much to do (R. 380). The doctor stressed the importance of getting Plaintiff involved in summer activities.

In October 1998, Plaintiff's mother told Dr. Norman Plaintiff had started the school year "great," but started having problems since. The doctor discussed starting Plaintiff on Clonodin. She also suggested "parent training," but Plaintiff's mother was "not interested."

In December 1998, Plaintiff's father notified Dr. Norman that Plaintiff had been out of control a lot (R. 378). The doctor's office told him there would be no further prescription refills until they came in to the office.

In April 1999, Dr. Norman noted that he met with Plaintiff's mother and a school representative (R. 376). The school reported that "half of the problem" was that Plaintiff did not have his medication consistently. The doctor explained that Plaintiff had missed appointments and therefore had not been prescribed refills of his prescription. The doctor informed the mother that she would write one prescription following a missed appointment, but not more.

The doctor also discussed the mother's behavior of sending Plaintiff up to his room where he had a Nintendo. He would often just keep coming out of his room until his mother went up. The doctor informed her this was not helping Plaintiff's behavior. She suggested taking the Nintendo away, but only for one night, but the mother "didn't seem to understand." She finally agreed to attend four counseling sessions to establish a behavior plan and then tape it to the refrigerator so that "she can begin to gain more control of David. Then the school might be able to control him as well."

On December 7, 1999, Dr. Norman Valley noted that Plaintiff's father had been sent to prison in September and since that time Plaintiff had been "out of control" (R. 374). His psychosocial impairment was found to be severe at that time and Dr. Norman referred Plaintiff for treatment to the Day Hospital at Chestnut Ridge.

Plaintiff was admitted to the Chestnut Ridge Day Hospital for hyperactivity and temper

problems on December 17, 1999 (age 11) (R. 427). He was on Ritalin. The evaluator found Plaintiff's grades in school had improved over the last year. Plaintiff and his mother both denied the Ritalin had helped either his behavior or his academic performance. He had all A's and B's in his current classes and was "essentially doing well" in his academic performance. His problems were mostly behavioral, specifically fighting or being physically or verbally aggressive. It was noted that Plaintiff's father was recently incarcerated.

Upon mental status examination, Plaintiff maintained good eye contact and smiled socially His speech was normal and he was alert and fully oriented. Concentration was intact. His mood was good with a congruent euthymic affect. Plaintiff was diagnosed with Oppositional Defiant Disorder and ADHD "by history." His global assessment of functioning was 50. His Ritalin was discontinued, but would be restarted if he began showing signs of ADHD. His mother stated she had never given him the Clonodin that was prescribed, so that was also discontinued.

Plaintiff did not attend the Day Hospital on December 20, 29, or 30 (R. 370). He was discharged at his mother's request. Apparently the medical staff had taken a blood sample from Plaintiff, after getting written permission from his mother. When he came home that day, however, she was upset by the needle mark in his arm. She testified she "must have misunderstood how they were going to take the blood sample because he had never had a big needle in his arm like that, you know, at his age [11]" (R. 509). She also said she had had no idea "they were giving him pills." She testified "they" had changed his medication, "giving him what they wanted him to have." She admitted she had given permission for this, but testified: "[E]ven though I gave them permission to do things there when I first took him there it feels like they should call me before they do anything, you know what I mean." He was discharged from the day program at her request on January 5, 2000,

with a diagnosis of oppositional defiant disorder and ADHD, and a GAF of 60[3] (R. 427). He was again prescribed Ritalin.

On January 11, 2000, Plaintiff's teacher wrote that Plaintiff's behavior was generally good in science class, but he did not participate very much (R. 294).

On February 22, 2000, Plaintiff's mother informed Dr. Norman that Plaintiff had been "out of control," continuing to throw and break things when angry (R. 373). The doctor switched Plaintiff from Ritalin to Adderall.

In March 2000, Plaintiff's bus driver recommended Plaintiff have special transportation arrangements because of his behavior. The driver stated:

> Although things go significantly better when David is on his medication and it is taken regularly, there are many mornings and afternoons that David does not have his medication. In the absence of medication, David's behavior on the bus is a danger to himself and to others.

(R. 240).

In March 2000, Plaintiff's IEP indicated he took medication for his ADHD (R. 281). It stated the medication seemed effective when used consistently. He seemed focused, sensible, and acted appropriately most of the time with the exception of when there was a substitute teacher. Even then he sometimes did ok with them. He had just started taking a new medication "which has resulted in successful positive behavior and attention to tasks." Before that, he had not had medication for about a month. The reason for his not having medication was stated as "due to being so expensive and Mrs. Lindsay not having the resources to purchase it." During the time he was without

---

[3]A GAF of 51-60 indicates **Moderate symptoms** (e.g., flat affect and circumstantial speech, occasional panic attacks) **OR moderate difficulty in social, occupational, or school functioning** (e.g., few friends, conflict with peers or coworkers). Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV"), 32 (4th ed. 1994). (Emphasis in original).

medication, Plaintiff was noncompliant, throwing things and hitting. Since starting the new medication, he was starting to attend to and complete tasks (R. 282).

Plaintiff's science teacher noted he received a B in science, based on the five assignments he had turned in (R. 285). However, he had turned in only five of ten assignments. The five assignments he turned in "occurred when he was on his medications and the ones not turned in, he was not medication." The teacher also stated that Plaintiff's task completion was good, even in his regular classroom, as long as he was on medication. It suffered when he was not medication or when there was a new person such as a substitute. He also seemed to choose whether he completed tasks or not.

In April 2000, Plaintiff's doctor reported that Plaintiff and his mother reported "striking improvement with David with change to Adderall" (R. 371). Plaintiff had been able to control his behavior at home and at school. He also expressed remorse for things he had done and even tried to repair the things he had broken around the house.

Plaintiff's mother filed the application for SSI on May 31, 2000.

In August 2000, Plaintiff's mother told Dr. Norman that Plaintiff "had a reasonable summer" (R. 440). His behavior had settled down and he wasn't as aggressive and violent. He had been compliant with his medication, with no side effects. She was hopeful he would have a better year in school. The doctor discussed working on Plaintiff's attitude, because the medication would not change that.

In September 2000, Plaintiff's Special Education teacher from the previous year (grade five) wrote that he had been classified as BD (behavioral disorder). He had been mainstreamed until the end of May, except in language arts and math (R. 206). His academic performance was satisfactory

when proper medication was provided and there were no distractions in the regular classroom. If he was focused and behaved, he could keep up with the class pace. His quality of work was good when he was on task. If on proper medication he had reciprocal, appropriate friendships with other children. Any sudden changes in behavior "were determined by whether the child had or had not taken medication" (R. 208). Plaintiff understood authority and rules, but on some days found these irrelevant. He could concentrate on activities he enjoyed and if there were no distractions, specific problems with attention or concentration were minimal.

On the Vineland Adaptive Behavior Scales completed in September 2000, Plaintiff scored in the "Adequate" range in the Daily Living Skills, Motor Skills, Communications Skills, and Socialization Skills domains (R. 238).

The school noted IQ testing utilizing the WISC-III indicated Plaintiff's IQ as 73 verbal, 80, performance, and 75 full scale in 1994; and verbal 70, performance 80 and full scale 73 in 1997 (R. 239). In 2000, it was noted Plaintiff's grades were mostly A's, B's and C's with an E in Science. His science grade was low only because he did not do written homework assignments (R. 239). It was noted he had difficulty with personal social interactions and with anger control and low self-esteem.

Plaintiff underwent a psychological evaluation in September 2000 (age 12, sixth grade) (R. 406). Upon mental status examination, the doctor found Plaintiff was cooperative, but "smiled as his mother talked about his devious behavior and seemed to be making a joke out of everything." He played with a little toy car, but when it was taken away, he did not protest. He argued "mildly" with his mother about his behavior. He seemed rather immature, but showed no oppositional, reckless, or violent behavior. He displayed normal eye contact. His ability to converse was "mildly

immature." Observed mood/emotion was calm, thought content was normal, insight was normal, and judgment was mildly deficient. Verbal IQ was 72, Performance 74 and full scale 71 (R. 410). The psychologist considered the results valid. Plaintiff was behind by one to three years in achievement tests. VMI was unreliable due to motivational problems. Plaintiff was diagnosed with oppositional defiant disorder, situational; attention deficit disorder, on report; and borderline mental retardation (R. 412). His concentration was moderately deficient, pace mildly deficient, and persistence mildly deficient. The psychologist found Plaintiff's activity level seemed to be mildly hyperactive. His cooperation was fair. His attitude was appropriate. He was interested and motivated. During verbal testing Plaintiff appeared mildly immature and silly, but the doctor believed this may have been because of embarrassment at not being able to answer the questions well.

An IEP completed in October 2000, indicated that at the end of the last school year, Plaintiff was achieving 80-100% of his goals of following directions and using appropriate questions, comments and conversations in a large group setting (R. 248). Any deficits appeared to be more a result of non-compliance than an inability to complete tasks. It was noted Plaintiff was eager to please, did well in academics, and had good hygiene (R. 265). It was also noted that Plaintiff's father was in jail and his parents were going through a divorce. It was specifically noted Plaintiff "tends to act up more without meds."

State agency reviewing psychologist Frank Roman completed a Childhood Disability Evaluation form in October 2000, finding Plaintiff had borderline IQ, ODD and ADHD, severe impairments, but did not meet, medically equal or functionally equal a listed impairment (R. 414). He found Plaintiff had no evidence of limitation in the motor area of functioning, and had a less than

marked impairment in the cognitive, social, and personal areas, but had a marked limitation of functioning in concentration, persistence or pace (R. 416). He opined that Plaintiff had a positive response to medication, especially since being switched to Adderall (R. 417). He opined that with proper medication and few distractions, Plaintiff was able to keep up with his class, and therefore his IQ test scores may be a low estimate.

In November 2000, Plaintiff's mother reported Plaintiff had been very difficult. School was calling every day. She noted he had been out of medication for two weeks, and she "notice[d] a striking difference between being on meds and off." His behavior was much better controlled on medication. He also had no side effects from medication.

On January 9, 2001, Plaintiff and his mother reported he was doing "about the same" (R. 438). His grades had "slipped a bit" due to his not doing his homework, but he was not getting into trouble at school He continued "to use the power move of breaking items when he's told 'No' at home." The doctor decided to discontinue Adderall and Clonodin, and started Plaintiff on Concerta.

In March 2001, Plaintiff presented at his visit with Dr. Norman angry at his mother and refusing to talk (R. 437). He said the new medication made him sleepy, then said he did not get to bed until 1:00 a.m. His mother worked at night "and isn't in charge of bedtime." Plaintiff would not sleep in his room, insisting on sleeping in the living room. The doctor opined this "probably sets things up so he can't sleep well." Plaintiff was fighting his mother regarding taking the new medication and wanted to return to Adderall, but his mother liked the Concerta better because it was easier to administer– only once a day.

Dr. Goots completed another Childhood Disability Evaluation form in March 2001, finding Plaintiff had borderline intellectual functioning and ADHD (R. 418). Although the impairments

were severe, they did not meet, medically equal or functionally equal any listing. He had less than marked limitations in acquiring and using information, attending and completing tasks, interacting and relating with others, moving about and manipulating objects, and caring for himself (R. 420-421).

In May 2001, Plaintiff's sixth grade teacher wrote that he was mainstreamed for all classes except social studies (R. 315). Plaintiff was capable of working at grade level, but "frequently chooses not to do the assignments." He could keep up with his class in spelling, but not in math, in which he would say, "I can't do this," without trying. He completed spelling assignments with little assistance and reading assignments with some encouragement, but not math. The teacher wrote:

> When David is taking his medicine he behaves appropriately 80% of the time. He hasn't had his meds for four weeks. In class he makes noises, whistles, etc. At breakfast and recess he has used very inappropriate language.

(R. 316). The teacher also wrote that Plaintiff could generally concentrate when on medication, but was easily distracted in group work or less structured activities. He had low self-esteem and was very self-conscious in class, but was doing better lately, beginning to answer questions. Ninety percent of the time Plaintiff related well to the teacher when on medication. He frequently used inappropriate language with other adults and children. He had friendships with girls, which had been the basis of several of his problems. He was capable of taking care of himself. He understood authority and rules. He had not had his medication for some time and this was showing in his behavior. The teacher stated Plaintiff had done exceptional work in the class at various times, but without his meds, "he really has a difficult time functioning."

In October 2001, Plaintiff's teacher completed a questionnaire, stating Plaintiff was capable of working at grade level but his behavior got in the way (R. 328). He could keep up with the class

19

if he chose to. He completed assignments, had excellent handwriting, and could be very concerned over the quality of his work. He could be very volatile if in a bad mood, however. He was usually only distracted by events that happened earlier in the day, "usually to do with a girl." He understood but did not always follow authority and rules.

Back in the fourth grade Plaintiff received many failing grades, but his lowest grades in the sixth grade were D's in science and health. He otherwise received B's and C's, and even an A in spelling. It is noted that these classes were all modified in some way, however.

At the hearing held on September 20, 2001, Plaintiff testified along with his mother (R. 448). Plaintiff was 13 years old and had just started the seventh grade at a new school. He was not on any medications at that time (R. 454). He was in regular classes except for one class for his behavioral problem (R. 458). He testified he had friends at school, some from his old school and some new. He testified he did not have much time to go outside because he took care of his 88-year-old great-grandfather who was blind and could barely walk. Plaintiff testified he changed him, made him things to eat and drink, got his glasses for him, and put his music on for him.

Plaintiff testified that he had not started out in a behavioral disorder class, but was placed there about the third week of school, after being suspended (R. 463). He testified he had touched a girl on the leg and the school said it was sexual harassment. He was doing very well in some classes, but he had trouble in social studies, math and music, mostly because he did not pay attention and did not do his work (R. 465). He said he was "just bored." He usually left his homework at school. He had taken a history book out of the library, and was enjoying reading it (R. 469). He said he liked being in school.

Plaintiff testified he played football with some friends over the summer at the park (R. 471).

He liked to hang out with his girlfriend, go fishing, and listen to music (R. 472). He saw his girlfriend about once a week. He went fishing about once a week. He smoked cigarettes, getting them from his mom's or grandfather's pack. Plaintiff testified he wanted to be a doctor when he grew up. He used to have a computer and chatted or e-mailed or surfed the web on it.

Plaintiff testified he got in trouble with the bus driver because he cussed him out and called girls names. The year before he rode on a special needs bus for the entire year.

Plaintiff testified he wanted to be on the football team at school, and was told he could be on it if he was good for two days (R. 486). He thought it would be difficult to be good for two days, however, because he did not have his medicine. He said he did not take it anymore, but his mother was going to get it for him again.

Plaintiff's mother testified that he was pretty good at helping take care of his great-grandfather (R. 495). He fixed him things to eat and helped bring him from the living room to the table. The ALJ asked when she took him off his medication, or whether she couldn't afford it, and the mother testified that it wasn't that she took him off of it (R. 496). She said she could not afford it. Her grandfather had paid $100.00 for the last prescription, but Plaintiff took and sold the pills. He told her he had sold them to a neighbor. He had apparently sold 97 of the 100 pills. Plaintiff testified he sold his prescription to get money to buy an engagement ring for his girlfriend (R. 502).

Plaintiff's mother testified that he did a lot better on the medication, but sometimes even on it he acted the same way. She also testified she could not afford $100 per month for the medication. She had gone to bankruptcy court and was going to go to Human Services when the paperwork was done. She testified she had not had a medical card for Plaintiff since March (R. 502). She said she had been to the welfare department many times but they always gave her "some kind of story" that they had lost something or she needed something else. Most recently, she was told she needed to

have her vehicle appraised, but it was not legal, so she couldn't drive it. The pills that Plaintiff had sold were purchased only a couple of months earlier.

Plaintiff's mother testified that Plaintiff's doctor had recommended counseling, but Plaintiff refused to go (R. 508). His father had told him he did not have to talk to anyone if he did not want to. Plaintiff then said he was not going to go. He said he would run away or kill himself or hurt other people. His mother testified that he would "always . . . throw something like that up in my face to try and make me feel bad or something or not do it."

Plaintiff started seeing a new doctor in September 2001, just after his administrative hearing (R. 441). He had stopped seeing Dr. Norman because it was too hard to get to her office now that they had moved. Plaintiff had last had medication one month earlier, because he had sold his last month's supply. His mother was to lock up his medication from now on. The mother and Plaintiff both reported the medication helped "a lot." Plaintiff would become hyper as it wore off, however. Plaintiff's mother told the doctor that Plaintiff refused counseling or anger management, telling her he would kill himself if she tried to take him anywhere.

The doctor noted that Plaintiff made poor eye contact, but was alert and cooperative. The doctor planned to re-start Plaintiff on Adderall, with the mother to "keep it locked up!" (exclamation in original).

### Evidence Submitted to the Appeals Council

On June 22, 2002, Plaintiff submitted a letter of argument with new evidence attached to the Appeals Council.

On January 2, 2002, Plaintiff's IEP team held another meeting regarding Plaintiff (Attachment A to Plaintiff's Motion). Plaintiff's mother did not attend the meeting. The IEP team determined that Plaintiff's disability (ADHD) impaired his ability to control his behavior, stating:

22

"David is reported to have problems w/ his inappropriate language in all environments." It was therefore recommended he have additional Special Education Services.

It was noted that Plaintiff could not stay on task in English assignments. He was having a hard time with writing complete sentences in his journal. These problems, however, did not result in an inability to complete appropriate classroom tasks, but instead were a non-compliance issue. It was also noted that Plaintiff, who was in 7th grade, read at the 10.5 grade reading level on standardized tests.

Another teacher noted that Plaintiff used inappropriate language, making vulgar and suggestive comments to female students. He also made noises "on occassion [sic] for no given reason other than boredom."

Another teacher wrote:

> David cannot attend to classroom instruction and work when he is not on his medication. He has a limited attention span and lacks focus on any task. He does however have the intellectual ability to comprehend and complete classroom instruction and tasks. David completes his homework at a "0%" but in a small setting he will complete his work with a small group setting and instruction [sic]. David is currently setting in close proximity to the main isles [sic] for access by teachers. This has helped with his behavior.

On February 12, 2002, Plaintiff received a five-day out-of-school suspension for refusing to take a quiz and then throwing a chair at another student, hitting him in the leg.

On March 13, 2002, it was noted that Plaintiff had grabbed another student and kneed him in the back, and kicked another student in the leg. He was to received a four-day out-of-school suspension. A meeting was scheduled for March 19, 2002, to discuss the issue. It was noted: "Parent must attend this meeting."

On March 19, 2003, the meeting was held regarding Plaintiff's behavior. His mother did not

attend. It was noted Plaintiff had been suspended a total of 28 days that school year. Triggers identified were: having a substitute teacher and/or inconsistent regulation of his medication. It was decided that Plaintiff would spend the next year in a "Behavior Intervention Class."

Valley Mental Health completed a "Current Level of Educational Performance" on June 3, 2002, noting that Plaintiff received formal social skill instruction. It was noted he used appropriate language 100% of the time. He used appropriate manners at all times while there. He was able to use and demonstrate appropriate coping skills and strategies when involved in a frustrating or conflict situation 100% of the time. During academics, Plaintiff willingly pursued and completed his tasks. He raised his hand appropriately and asked for help as needed while working independently. He was hesitant reading aloud and would skip words and lines when reading silently or aloud. He often tried to answer questions after only skimming, necessitating redoing an assignment with closer supervision. Math was most difficult. He struggled with basic math facts. He also did not have command of his multiplication tables.

Plaintiff's Special Education teacher noted:

> David takes Concerta for Attention Deficit Disorder (ADD). When he had not taken his medication he had a noticeably difficult time focusing on task. He would look around the room, look outside, tap his pencil, stare off into space, and was much more easily distracted than when he took the medication consistently. He readily talks about what bothers him and acknowledges a need to control his anger.
>
> In conclusion, David has done well within the BIC environment. He has demonstrated a good sense of humor, a willingness to discuss issues including his own, and has been a pleasure to be around.

The teacher completed a Functional Behavior Assessment on June 5, 2002, for Plaintiff's regular school. Achievement Testing showed Plaintiff was average in broad reading, broad written language, basic reading skills, and academic skills; low average in total achievement, written

24

expression, and academic applications; low in academic knowledge; and very low in broad math and math calculation skills. He scored at only the third grade level in these math skills. On the other hand, he scored at the tenth grade level (while in the seventh grade) in basic reading skills, and at the 13th grade level in writing samples and word attack. His IQ was reported as 70 verbal, 80 performance, and 73 full scale on the WISC III in 1997, and 73 verbal, 80 performance, and 75 full scale on the WISC III in 1994. The teacher found Plaintiff did have "clinically significant" conduct problems, anxiety, and somatization, but found his social skills, hyperactivity, and aggression were "average." He was determined to be "at risk" in attention problems, learning problems, and study skills (meaning either there was a significant problem that was not severe enough to require formal treatment, or there was a potential for developing a problem that needed careful monitoring).

### III. Administrative Law Judge Decision

Utilizing the three-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. §§ 416.924 and 416.920, the ALJ made the following findings:

1. The claimant has not engaged in substantial gainful activity since the alleged onset of disability (20 CFR § 416.972).

2. The claimant has borderline intellectual functioning, attention deficit hyperactivity disorder, and oppositional defiant disorder, which are severe impairments (20 CFR 416.924(c)).

3. The allegations of disabling functional limitations attendant to the claimant's impairments made at the hearing are not credible as they are not supported by the evidence of record.

4. The limitations resulting from the effects of the claimant's impairments present since May 31, 2000, do not meet, medically equal, or functionally equal the criteria of any of the listed impairments in Appendix 1, Subpart P, Regulations No. 4 (20 CFR § 416.924(d)).

5. Since May 31, 2000, the claimant has not had a combination of medically determinable physical or mental impairments that result in marked and severe functional limitations.

25

6.      The claimant has not been under a "disability" as defined tin the Social Security Act, at any time since May 31, 2000 (20 CFR § 416.924(d)).

## IV.  Contentions

Plaintiff contends:

1.      The ALJ erred in failing to consult a medical expert to interpret discrepancies in Plaintiff's IQ scores and

2.      Substantial evidence in the record supports a finding that Plaintiff has marked limitations in at least two functional domains:

    a.      Attending and completing tasks and

    b.      Interacting and relating to others.

Defendant contends:

1.      Medical expert testimony was not necessary and

2.      Plaintiff does not have two marked limitations.

## V. Discussion

### A. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case

before a jury, then there is 'substantial evidence.'" Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

## B. The Sequential Evaluation for Child Disability

Under 42 U.S.C. §§ 1382c(a)(3)(C)(i),(ii), a child under the age of eighteen who does not engage in substantial gainful activity is considered disabled if he "has a medically determinable physical or mental impairment which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or is expected to last for a continuous period of not less than 12 months." The regulations implementing this law provide that the ALJ first must determine whether the child is engaging in substantial gainful activity. See 20 CFR § 416.924(b). If the child is not, then the ALJ must determine whether the child's impairment is severe. 416.924(c). If the child's impairment is severe, then the ALJ must determine whether the impairment meets, medically equals or functionally equals the criteria for an impairment listed in the disability regulations. 416.924(d). Only a child whose impairment meets, medically equals or functionally equals a listed impairment is considered disabled.

## C. The ALJ's Decision

In the instant case the ALJ found that Plaintiff was not engaged in substantial gainful employment. Neither party disputes this finding. The ALJ next found that Plaintiff had severe impairments – Attention Deficit Hyperactive Disorder, Oppositional Defiant Disorder, and Borderline Intellectual Functioning (R. 27). Plaintiff disputes this finding, arguing that his IQ scores

are at the level of Mental Retardation instead of Borderline Intellectual Functioning. Should Plaintiff be found Mentally Retarded he would be disabled under Listing 112.05, due to his additional severe impairments of ADHD and ODD.

### D. Need for a Medical Expert/ Listing 112.05

Plaintiff first argues that the discrepancy in Plaintiff's IQ scores required the ALJ to consult a Medical Expert. Along with this argument is the contention that Plaintiff's IQ scores fell in the Mentally Retarded range, and that he was therefore disabled under Listing 112.05. Plaintiff was tested five times, obtaining the following IQ scores:

8/30/94: V73, P 80, FS 75 (R. 239)

4/28/95: V60, P 83, FS 70 (R. 339)

8/7/95:  V80, P 93, FS 84 (R. 351)

2/18/97: V70, P 80, FS 73 (R. 356)

9/19/00: V72, P 74, FS 71 (R. 410)

Plaintiff first contends the ALJ erred by citing the "valid scores from the testing in August 1995" to support his conclusion that Plaintiff had borderline intellectual functioning rather than mental retardation. The ALJ did not simply cite the 1995 test, however. Although he emphasized the August 1995 test results, he also discussed the April 1995 results and the examiner's comments regarding the low verbal score; the testing administered in February 1997 and the comments regarding Plaintiff's behavior during that test; and the most recent test results from September 19, 2000. The undersigned therefore finds the ALJ did not err in his analysis of the I.Q. test results.

Plaintiff also argues that the discrepancy between the various I.Q. tests scores required the ALJ to consult a Medical Expert. The undersigned disagrees. Plaintiff cites HALLEX I-2-5-34, which states that the ALJ must obtain an ME opinion: (1) When the Appeals Council or a court so

orders; (2) To evaluate and interpret background medical test data; or (3) When the ALJ is considering a finding that the claimant's impairment(s) medically equals a medical listing. Plaintiff contends (2) and (3) apply here. The ALJ was not, however, evaluating and interpreting <u>background medical test data</u> when he analyzed the IQ test scores. According to HALLEX, examples of "medical test data" include "the actual x-ray films" supporting a radiologist's report and "'raw' test data such as answer sheets ro drawings" supporting a psychological test report. Here the ALJ was evaluating and interpreting only the scores and reports themselves, not the "raw" test data. As for the ALJ's determination of whether Plaintiff medically equaled a listing, Social Security Ruling ("SSR") 96-6p provides:

> The signature of a State agency medical or psychological consultant on an SSA-831-U5 (Disability Determination and Transmittal Form) or SSA-832-U5 or SSA-833-U5 (Cessation or Continuance of Disability or Blindness) ensures that consideration by a physician (or psychologist) designated by the Commissioner has been given to the question of medical equivalence at the initial and reconsideration levels of administrative review. Other documents, including the Psychiatric Review Technique Form and various other documents on which medical and psychological consultants may record their findings, may also ensure that this opinion has been obtained at the first two levels of administrative review.

> When an administrative law judge or the Appeals Council finds that an individual['] s impairment(s) is not equivalent in severity to any listing, the requirement to receive expert opinion evidence into the record may be satisfied by any of the foregoing documents signed by a State agency medical or psychological consultant.

In present case the record contains Childhood Disability Evaluation Forms signed by State agency psychological consultants in the record. These support the ALJ's finding that Plaintiff's impairments did not medically equal a listed impairment. <u>See</u> Dr. Roman's report @ R.414 ("Impairment(s) severe, but does not meet, medically equal, or functionally equal the severity of a

listing") and Dr. Goots' report @R. 418 ("Impairment or combination of impairments is severe, but does not meet, medically equal, or functionally equal the listings."). Significantly, Dr. Roman expressly noted: " . . . . IQ testing may be a low estimate."

The requirement of receiving expert evidence was satisfied by these documents. The undersigned therefore finds it was not necessary for the ALJ to consult a Medical Expert to evaluate Plaintiff's IQ scores.

Underlying Plaintiff's argument is the contention that his scores indicate he is Mentally Retarded and therefore meets Listing 112.05, which provides, in pertinent part:

> 112.05 *Mental Retardation:* <u>Characterized by significantly subaverage general intellectual functioning</u> with deficits in adaptive functioning.
>
> 1. The required level of severity for this disorder is met when the requirements in A, B, C, D, E, or F are satisfied . . . .
>
> D. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant limitation of function;
>
> OR
>
> E. A valid verbal, performance, or full scale IQ of 60 through 70 and:
>
> . . . .
>
> 2. For children (age 3 to attainment of age 18), resulting in at least one of paragraphs B2b or B2c or B2d of 112.02 . . . .

(Emphasis added).

It is indisputable that Plaintiff has obtained verbal scores of 70, and even one of 60 on I.Q. tests. However, the undersigned finds significant the fact that Plaintiff does not carry a diagnosis of mental retardation. Where Plaintiff obtained the 60 verbal IQ score, the evaluator noted:

> David was extremely active during the evaluation and required

30

> frequent redirection to complete the tasks. His effort was also noted to be poor at times. These results are considered an accurate reflection of his current level of functioning, but may underestimate his best performance.

(R. 339). Further:

> David's performance on the Woodcock-Johnson (revised), an individually administered test of academic achievement . . . . indicate[s] that David demonstrates a range of achievement, with areas such as reading an[d] written language representing relative strengths. These findings are somewhat discrepant with his poorer performance on the intellectual measure (in particular verbal comprehension tasks) and may more accurately reflect his level of functioning.

(R. 340). Plaintiff, who was near the end of first grade at the time, scored at the first grade level in broad reading and broad written language, which, as the psychologist found, was inconsistent with his 60 verbal IQ score which would have placed him in the lowest 1% in the nation. He scored at the kindergarten level in broad math, broad knowledge, and skills, still only a little more than a year below his actual grade level, and inconsistent with a finding of mental retardation.

In addition to the psychologists diagnosing Plaintiff as having borderline intellectual functioning instead of mental retardation, his schools also did not label him mentally retarded. To the contrary, Plaintiff was in regular classes much of the time, working at grade level in most subjects. He was removed from regular classes usually because of his behavior or attention problems. Most of his teachers stated that he could work at grade level when he wanted to.

In December 1997, Plaintiff's regular teacher wrote that he was working at grade level in reading, math, science, social studies, health, spelling, and writing. He had the ability to complete assignments, although he often did not. Plaintiff's special education teacher also wrote in December 1997, that Plaintiff was working at grade level in reading, math, science, social studies, health, spelling, and writing. He opined that Plaintiff's main academic difficulty was his behavior, and that

he would progress at the "normal" rate if his behavior was under control. When on medication, academic gains were noted on a consistent basis.

In 1999, Plaintiff had all A's and B's and was "essentially doing well" in his academic performance. Plaintiff had been mainstreamed that year, and his academic performance was satisfactory when proper medication was provided and there were no distractions. If he was focused and behaved, he could keep up with the class pace, and his quality of work was good.

In 2000, Plaintiff's grades were A's, B's and C's, with an E in science. It was reported his science grade was low only because he did not do written homework assignments.

In May 2001, Plaintiff was mainstreamed for all classes except social studies. He was reportedly capable of working at grade level. In October 2001, Plaintiff again was reported to be capable of working at grade level, although his behavior got in the way.

The above evidence is inconsistent with a finding of mental retardation and substantially supports the ALJ's determination that Plaintiff had, at worst, borderline intellectual functioning.

Finally, in addition to all of the above, the undersigned notes that the listings for childhood mental impairments provide:

> IQ test results must also be sufficiently current for accurate assessment under 112.05. Generally, the results of IQ tests tend to stabilize by the age of 16. Therefore, IQ test results obtained at age 16 or older should be viewed as a valid indication of the child's current status, provided they are compatible with the child's current behavior. IQ test results obtained between ages 7 and 16 should be considered current for 4 years when the tested IQ is less than 40, and for 2 years when the IQ is 40 or above. IQ test results obtained before age 7 are current for 2 years if the tested IQ is less than 40 and 1 year if at 40 or above.

The only IQ result that was current at the time of the administrative hearing and ALJ decision under the Regulation is from the September 19, 2000, test in which Plaintiff obtained scores of V 72, P 74,

32

and FS 71.

For all the above reasons, the undersigned finds substantial evidence supports the ALJ's determination that Plaintiff was not mentally retarded and did not meet or medically equal listing 112.05.

### E. Functional Equivalence

Having found Plaintiff did not meet or medically equal a listing, the ALJ was next required to determine whether Plaintiff's impairments "functionally equal[ed] the criteria for an impairment listed in the disability regulations." 416.924(d). 20 CFR § 416.926 provides:

> By "functionally equal the listings," we mean that your impairment(s) must be of listing-level severity; i.e., it must result in "marked" limitations in two domains of functioning or an "extreme" limitation in one domain, as explained in this section.

Domains are "broad areas of functioning intended to capture all of what a child can or cannot do." §416.926a(1). The domains are:

> (i) Acquiring and using information;
> (ii) Attending and completing tasks;
> (iii) Interacting and relating with others;
> (iv) Moving about and manipulating objects;
> (v) Caring for yourself; and
> (vi) Health and physical well-being.

*Id.* An "extreme" limitation is present if there is no meaningful function in a category. 20 CFR §416.926a(c)(3). Plaintiff does not argue, and the evidence does not support a finding that Plaintiff had an "extreme" limitation in one domain. There is no evidence that Plaintiff has "no meaningful function" in any of the domains. He must therefore have marked limitations in two domains of functioning to be found disabled.

The ALJ found Plaintiff's limitations in the six domains as follows:

> 1. Acquiring and Using Information - Less than Marked limitation.

2. Attending and Completing Tasks – Less than Marked limitation.
3. Interacting and Relating with Others – Less than Marked limitation.
4. Moving About and Manipulating Objects – No limitation.
5. Caring for Yourself – Less than Marked limitation.
6. Health and Physical Well-Being – No limitations

(R. 29-32).

Plaintiff argues that he has "marked" limitations in two of the domains of functioning –

"attending and completing tasks," and "interacting and relating with others." Defendant contends

Plaintiff does not have marked limitations in two domains.

Plaintiff first argues in particular that four reasons the ALJ gave for finding Plaintiff did not

functionally equal the listings were error. All four reasons were contained in the same paragraph of

the Decision:

> The record establishes that the claimant's behavioral problems are
> controllable with prescribed medication, but that the claimant was
> allowed to sell his prescription medication. The claimant has had no
> counseling for his behavior problems based on the unchallenged
> threat to his mother that he would harm himself if she tried to take
> him for treatment. He was able to testify satisfactorily at the hearing.
> Despite his alleged destructive behavior, he has had no significant
> involvement with legal authorities.

(R. 29). The record shows the above four statements are factually correct.

First, there are numerous statements in the record reflecting that Plaintiff's behavior problems

were controllable with medication. In May 1997, Plaintiff mother reported the medication helped

him a lot, although he still had problems. His behavior was improved when he was on the

medication. In September 1997, his mother reported he was having no behavior problems in a new

school, and the Ritalin was really helping. In October 1997, his mother called Dr. Norman, reporting

Plaintiff had been doing well on the medication. Although Plaintiff's mother later stated the

medication was not helping, Plaintiff's own father, and his grandmother, who watched Plaintiff on

the weekends, both believed there was a difference, as did Plaintiff's treating physician.

In December 1997, Plaintiff's teacher wrote that his problem behaviors increased when he was not administered his medication on a regular basis; that if Plaintiff did not have his medication his behavior worsened dramatically; and that if medication was not administered on a regular schedule, he was very easily distracted. Plaintiff's Special Education teacher wrote that Plaintiff's problem behaviors occurred more frequently when the medication had not been distributed and increased when the medicine was not distributed on a regular basis or was only given him at school. She expressly noted:

> If medication is not distributed on a regular schedule he can be easily distracted and has trouble concentrating . . . . When David is on his regular medication schedule, academic gains are noted on a consistent basis.

(R. 117).

Yet another teacher wrote that Plaintiff did not relate or interact well with others when he had no meds. His behavior worsened because he did not have his medication. Without medication his behavior was very inappropriate. He exhibited a sudden change of behavior due to "no meds" and he was easily distracted if he did not have his medication.

Plaintiff's father wrote in December 1997, that he thought the medicine worked okay while Plaintiff was taking it, but when he ran out he was bad.

In February 1998, Plaintiff's mother reported that the school had noticed a positive difference in Plaintiff's behavior since his medication was changed.

In April 1999, a school representative reported that "half the problem" was that Plaintiff did not have his medication consistently.

In March 2000, Plaintiff's bus driver reported:

Although things go significantly better when David is on his medication and it is taken regularly, there are many mornings and afternoons that David does not have his medication. In the absence of medication, David's behavior on the bus is a danger to himself and others.

(R. 240).

After Plaintiff was switched to Adderall in March 2000, the school reported the medication was effective when used consistently. Plaintiff was focused, sensible and acted appropriately most of the time, unless there was a substitute teacher. Even then, he sometimes did "ok." The new medication resulted in "successful positive behavior and attention to tasks." He had not had any medication before that for about a month. On that one occasion, his mother reported the medication was expensive and she did not have the resources to purchase it.

In April 2000, both Plaintiff and his mother reported "striking improvement" on Adderall. He was controlling his behavior at home and in school. He was even trying to repair things he had broken. In August, Plaintiff had a "reasonable summer." His behavior had settled down.

In September 20000, Plaintiff's teacher wrote that if on proper medication, Plaintiff had reciprocal appropriate friendships with other children, and any sudden changes in behavior were determined by whether he had or had not taken medication.

In October 2000, the school noted that Plaintiff tended to act up more without meds, but also noted he was eager to please and did well in academics, and was achieving 80-100% of his goals.

In November 2000, Plaintiff had been out of medication for two weeks, and his mother noticed a striking difference. His behavior was much better controlled on medication.

In May 2001, Plaintiff's sixth grade teacher wrote that when Plaintiff was taking his medicine he behaved appropriately 80% of the time, but he hadn't had his meds for four weeks. He was whistling in class, making noises, and using inappropriate language at breakfast and recess. She

noted he could concentrate when on medication 90% of the time. In September 2001, Plaintiff and his mother reported the mediation helped a lot. He related well when on medication. He had not had it for a month, however, because he had sold his last prescription.

All of the above evidence supports the ALJ's determination that Plaintiff's problems were controlled by medication. If a symptom can be reasonably controlled by medication or treatment, it is not disabling. Gross v. Heckler, 785 F.2d 1163 (4th Circ. 1986). The undersigned therefore finds substantial evidence supports the ALJ's determination that Plaintiff's impairments were controlled by medication and were therefore not disabling.[4]

Underlying Plaintiff's argument in this regard is his contention that he could not afford his medication. In Lovejoy v. Heckler, 790 F.2d 1114 (4th Cir. 1986), the Fourth Circuit held that it would be improper to reach the ultimate conclusion that a claimant was not disabled because he failed to follow prescribed treatment when failure was justified by lack of funds. Here, however, the only mention that Plaintiff ran out of medication or missed appointments due to financial problems comes during his mother's testimony at the hearing and in one school report in March 2001. The vast majority of the time it appears that Plaintiff's prescriptions were not renewed simply because he had not seen his doctor as scheduled. Generally, as soon as the lack of medication began affecting Plaintiff's school behavior, his mother would make an appointment and obtain the medication.

For example, in October 1997, Plaintiff was sent home from school because he did not have any medication and was misbehaving. That same day his mother called Dr. Norman, who renewed

---

[4]Plaintiff argues that the ALJ's statement that Plaintiff was "allowed to sell" his medication was "demeaning," "as if his mother knew of the act and encouraged it." The undersigned does not ascribe that meaning to the ALJ's use of the word "allowed," however. The word "allowed" is also defined by the American College Dictionary as "to permit involuntarily, by neglect or oversight." The undersigned finds this a reasonable interpretation of the ALJ's remark, and also finds it factually correct.

the prescription. There was no mention of financial difficulties. In February 1998, Plaintiff's mother called Dr. Norman, requesting a refill. Plaintiff had not kept his appointment scheduled for the day before, however, so the doctor rescheduled him for February 17. Plaintiff's mother called on February 18, again stating Plaintiff needed a refill. The doctor rescheduled him for February 24. At no time during these calls to Dr. Norman or during the February 24, 1998 appointment, was there any mention that the appointments were missed or that Plaintiff was out of medication due to financial difficulties.

In July 1998, Plaintiff was again out of medication, not having seen Dr. Norman since February (he apparently missed his scheduled March appointment). Yet again there is no mention of financial difficulties.

In April 1999, where a school representative met with Plaintiff's mother and Dr. Norman, the school representative reported that "half the problem" was that Plaintiff did not have his medication consistently. Dr. Norman explained that she could not refill his prescription after he missed appointments. There was again no mention of financial difficulties as the reason for missed appointment or failures to renew prescriptions.

In November 2000, Plaintiff's mother reported to Dr. Norman that Plaintiff had been out of medication for two weeks (R. 439). There is again no indication she ever discussed financial difficulties, however, and the doctor refilled Plaintiff's medications that same day. There is further no mention of financial difficulties or the lack of a medical card during Plaintiff's last appointment with Dr. Norman in March 2001 (R. 437). Plaintiff then switched doctors, seeing Dr. Forssell in September 2001. In between, however, Plaintiff apparently refilled his medication at least once, because Dr. Forssell was told in September that Plaintiff had "sold last months supply" (97 out of 100 pills) (R. 441). His mother told Dr. Forssell the reason they stopped seeing Dr. Norman was

38

because it was "too hard to get there" Since they had moved. Once again there is no mention of any financial difficulties, past or present.

Plaintiff did work, admittedly grossing only about $900.00 per month. Still, she was not indigent. There is no reference in the record that Plaintiff's mother ever asked if there were a less expensive or generic medication. Nor is there any reference to her asking if there were any free or low-cost clinics or other alternatives. Counsel for Plaintiff noted that Plaintiff had not had medical insurance since March 2001. He apparently had insurance again in late September of that year. He was therefore without a medical card for only six months, and he did obtain at least one month's worth of medication during that time (although he sold it). That does not explain the many times before he was without his medical card that Plaintiff ran out of his medication or missed appointments.

In addition, Plaintiff's mother testified she had tried to hire several people to take care of her grandfather, evidencing some ability to pay them. The grandfather had apparently paid for the last prescription that Plaintiff had sold. The undersigned therefore finds Plaintiff's argument that he did not have medication because he could not afford it is without substantial support in the record.

The ALJ's statement regarding Plaintiff's lack of counseling is also factually correct. At the hearing, Plaintiff's mother testified that Dr. Norman wanted Plaintiff to go to a counselor. Counsel asked: "And did you follow up on that?" to which Plaintiff's mother responded:

> No, ma'am, I didn't because he refused to go and his father also told him he didn't have to talk to anybody if he didn't want to so that it won't help him. He just said he wasn't going after that. And then he always says things like he'll run away or he'll kill himself or he'll hurt other people. Always, he always has to throw something like that up in my face to try and make me feel bad or something or not do it.

(R. 508). Plaintiff argues that she testified that Plaintiff "had seen many a counselor before," but

that statement was in response to the question: "They don't have a counselor at school for the children?" (R. 510).

As to the ALJ's third statement, Plaintiff did testify well at the hearing. He apparently was polite and well-behaved, answered all the questions asked, and seemed focused, during a nearly two-hour hearing, all despite the fact that he apparently had not had his medication for at least a month.

Finally, the ALJ was also correct that Plaintiff had no significant involvement with legal authorities. Although Plaintiff states he was placed in a juvenile residential facility by his mother in late 2003, this event is well past the time period relevant here. The ALJ's decision was entered more than two years earlier, and the Appeals Council's decision one year earlier. There is no evidence regarding whether Plaintiff was medicated, undergoing counseling, etc. in 2003. The information is therefore not relevant to the decision presently before the Court – that is, whether substantial evidence supports the ALJ's determination of September 2001.

The undersigned therefore finds no reversible error in the ALJ's statements as noted above.

Finally, the above-quoted paragraph was not the ALJ's sole discussion regarding functional equivalence. Plaintiff contends he has "marked limitations" in the domain of "attending and completing tasks" and "interacting and relating with others." The ALJ first notes that many of the examples of Plaintiff's behavior problems occurred prior to the relevant time period, which began May 31, 2000. Just prior to that date, Plaintiff and his mother had reported a "striking improvement" in his behavior since his medication was changed. He was able to control his behavior both in school and at home. He even tried to fix things he had broken. In August 2000, Plaintiff's mother reported he had had a "reasonable summer." His behavior had settled down. That September, Plaintiff's teacher from the year before noted his academic performance was satisfactory, his quality of work was good, and he had reciprocal, appropriate friendships with other children. In September,

Plaintiff's teacher wrote that his academic performance was satisfactory and he could keep up with the class pace when proper medication was provided. He also could concentrate on activities he enjoyed and if there were no distractions, specific problems with attention or concentration were minimal. He had reciprocal, appropriate friendships with other children when on proper medication. On the Vineland Adaptive Behavior Scales he scored an "adequate" in Socialization Skills, Daily Living Skills, Motor Skills, and Communications Skills. His grades were mostly A's, B's, and C's, with one E in science, only because he did not do his written homework. Dr. Andrews found Plaintiff's concentration only moderately deficient and his persistence and pace only mildly deficient. Plaintiff's teachers during the relevant time noted he was keeping up with the classes, except math. He could concentrate when on medication. He completed assignments and was concerned about the quality of his work.

All of the above evidence substantially supports the ALJ's determination that Plaintiff had a "less than marked" limitation in the attending and completing tasks and interacting and relating with others domains when on proper medication.

Plaintiff correctly argues that State agency reviewing physician Frank Roman found Plaintiff had "marked" limitations in concentration, persistence and pace, and that the ALJ failed to address this finding. The undersigned does not find this to be reversible error, however, because even if the ALJ agreed with Dr. Roman, Plaintiff would still only have one "marked" limitation, and would therefore still not be considered disabled. § 426.926a(n) provides that "the responsibility for deciding functional equivalence rests with the Administrative Law Judge or Appeals Council." Additionally, Dr. Roman stated in his "Explanation of Findings" that Plaintiff showed a positive response to his medication, especially since being switched to Adderall, and that he was able to keep up with the class pace with proper medications and few distractions. Dr. Roman concluded: "The impairments

do not meet/equal a listing [and] do not result in a marked limitation of function."

Finally, 20 CFR § 416.926 expressly defines "functionally equal[ing] the listings," as meaning the impairment(s) "must be of listing-level severity." (Emphasis added). Significantly, the Regulations themselves contain examples of impairments that do functionally equal the listings, as follows:

> (m) *Examples of impairments that functionally equal the listings.* The following are some examples of impairments and limitations that functionally equal the listings. Findings of equivalence based on the disabling functional limitations of a child's impairment(s) are not limited to the examples in this paragraph, because these examples do not describe all possible effects of impairments that might be found to functionally equal the listings. As with any disabling impairment, the duration requirement must also be met (*see* §§416.909 and 416.924(a)).
>
> (1) Documented need for major organ transplant (e.g., liver).
>
> (2) Any condition that is disabling at the time of onset, requiring continuing surgical management within 12 months after onset as a life-saving measure or for salvage or restoration of function, and such major function is not restored or is not expected to be restored within 12 months after onset of this condition.
>
> (3) Frequent need for a life-sustaining device (e.g., central venous alimentation catheter), at home or elsewhere.
>
> (4) Effective ambulation possible only with obligatory bilateral upper limb assistance.
>
> (5) Any physical impairment(s) or combination of physical and mental impairments causing complete inability to function independently outside the area of one's home within age-appropriate norms.
>
> (6) Requirement for 24-hour-a-day supervision for medical (including psychological) reasons.
>
> (7) Infants weighing less than 1200 grams at birth, until attainment of 1 year of age.
>
> (8) Infants weighing at least 1200 but less than 2000 grams at birth, and who are small for gestational age, until attainment of 1 year of age. (*Small for gestational age* means a birth weight that is at or more than 2 standard deviations below the mean or that is below the 3rd growth percentile for the gestational age of the infant.)

(9) Major congenital organ dysfunction which could be expected to result in death within the first year of life without surgical correction, and the impairment is expected to be disabling (because of residual impairment following surgery, or the recovery time required, or both) until attainment of 1 year of age.

(10) Gastrostomy in a child who has not attained age 3.

§ 416.927(m).

Although these examples are certainly not exhaustive and are not binding on the ALJ, they are instructive as indicating the severity required to functionally equal a listing. There is no evidence in the record that Plaintiff's impairments, although severe, are anywhere near the severity of the above examples. The evidence shows that, when on proper medication, Plaintiff was able to keep up with regular classes, have friends, play, take care of his great-grandfather, take care of his own needs, understand authority and rules, and behave appropriately.

For all the above reasons, the undersigned finds substantial evidence supports the ALJ's determination that David W. Lindsay was not under a disability, as defined in the Social Security Act, at any time through the date of his decision.

## VI. Recommendation

For the reasons herein stated, I find substantial evidence supports the Commissioner's decision denying David W. Lindsay's application for SSI benefits. I accordingly recommend Plaintiff's Motion for Summary Judgment be **DENIED**, Defendant's Motion for Summary Judgment be **GRANTED,** and this matter be dismissed from the Court's docket.

Any party may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable W. Craig Broadwater, United States

District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk of the Court is directed to mail an authenticated copy of this Report and Recommendation to counsel of record.

Respectfully submitted this _5_ day of May, 2006.

John S. Kaull

JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE